Joseph SMITH, Plaintiff–Appellant,

v.

Janice YARROW, et al., Defendants–
Appellees.

No. 01–4033.

United States Court of Appeals,
Sixth Circuit.

Oct. 20, 2003.

Before CLAY and GIBBONS, Circuit Judges, and CLELAND, District Judge.*

CLAY, Circuit Judge.

Plaintiff Joseph Smith, an Ohio prisoner proceeding *pro se*, appeals from the district court's judgment, entered on Septem-

ber 13, 2001, which granted summary judgment to Defendants Janice Yarrow et al., and dismissed Plaintiff's lawsuit. Plaintiff had filed suit against Defendants pursuant to 42 U.S.C. §§ 1983 and 1985, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, alleging deliberate indifference to Plaintiff's medical condition; retaliation and conspiracy to retaliate against Plaintiff for filing grievances and a lawsuit on the deliberate indifference claim; discrimination on the basis of race; and discrimination on the basis of disability. Plaintiff is not pursuing the race or disability discrimination claims on appeal, but he is pursuing the other claims. In contending that the district court erred in granting summary judgment to Defendants, Plaintiff purports to raise eighteen issues for review, including a number of complaints about the district court's handing of the discovery process. For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court.

**I.**

On July 20, 2000, Plaintiff filed suit in the United States District Court for the Northern District of Ohio, against Janice R. Yarrow, Maria J. Armstrong, Patricia Crouthers, Darlene Drwal, Bennie Kelly, Francisco Leano, Lois Rathwell–Love, Norman Rose, and Robert K.E. Winkle (collectively "Defendants"). Plaintiff alleged that Defendants were deliberately indifferent to Plaintiff's need for medical treatment for his hernia condition; that Defendants assigned Plaintiff to heavy lifting work despite his disabling condition; that Defendants gave Plaintiff inferior medical care in retaliation for his prior lawsuits; and that Defendants discrimi-

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

nated against Plaintiff on the basis of race.[1]

On October 10, 2000, Defendants filed a motion to dismiss Plaintiff's complaint, asserting that the complaint was frivolous, untimely, and moot. Plaintiff filed a memorandum in opposition to Defendants' motion to dismiss. The district court granted Defendants' motion to dismiss Plaintiff's complaint to the extent that the complaint sought injunctive relief,[2] but otherwise denied Defendants' motion. The court also set up a case management plan allowing for some discovery.[3]

The district court also allowed Plaintiff to file an amended complaint on October 31, 2000. In his amended complaint, Plaintiff added Defendant Todd Marti, as well as some factual allegations to bolster his claims. Count One alleged that Defendants Leano, Drwal, Rathwell–Love, Rose, Yarrow and Crouthers violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Count Two alleged that Defendants Leano, Drwal, Rathwell–Love, Rose, Yarrow and Crouthers discriminated against Plaintiff in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. Count Three alleged that Defendants Leano, Drwal, Rathwell–Love, Rose, Yarrow, Crouthers, Kelly, Armstrong, Winkle, and Marti conspired to retaliate and did retaliate against Plaintiff for exercising his constitutional and statutory rights, including those secured by the First, Sixth, Eighth, and Fourteenth Amendment, in violation of 42 U.S.C.

§ 1983; moreover, Count Three alleged that those Defendants conspired to "impede, hinder, obstruct, and defeat the due course of justice, with the intent of depriving prisoners in general, and black prisoners in particular, the equal protection of the law, and are liable therefor pursuant to 42 U.S.C. § 1985(2) and (3)." Count Four alleges that Defendants Yarrow, Crouthers, and Kelly discriminated against Plaintiff on the basis of his race in violation of his Fourteenth Amendment equal protection rights, and are therefore liable pursuant to 42 U.S.C. § 1983.

Defendants filed another motion to dismiss on November 14, 2000, and Plaintiff amended his complaint for the second time on November 24, 2000. The district court ultimately denied Defendants' motion to dismiss Plaintiff's amended complaint on February 1, 2001. Subsequently. Defendants filed an answer on February 12, 2001.

A steady barrage of motions were filed over the ensuing months, out of which arose a number of discovery disputes. Plaintiff repeatedly tried to compel discovery, which Defendants at times opposed. Plaintiff also attempted to amend his complaint for a third time, which the district court denied because the motion exceeded the deadline to amend by thirteen days. Plaintiff also sought to strike all of Defendants' motions which were filed electronically through the Northern District's electronic case filing system. The district court denied this motion as well. Both parties also filed notices of fraud regarding

---

1. Plaintiff's original complaint is not included in the joint appendix.

2. The district court determined that injunctive relief was moot because Plaintiff had been transferred to another facility.

3. Specifically, the case management plan called for non-expert discovery due by Febru-

ary 16, 2001; expert reports exchanged on or before March 16, 2001 for Plaintiff and expert discovery completed on or before April 16, 2001. The joining of parties and pleading amendments were due by December 1, 2000. Dispositive motions were due by May 16, 2001, with a settlement conference scheduled for April 23, 2001.

certain documents produced during discovery.

In April 2001, the district court dismissed Defendant Todd Marti from the lawsuit. On June 13, 2001, Defendants filed a motion for summary judgment as to the remaining claims and defendants. Plaintiff filed his opposition to Defendants' summary judgment motion on June 28, 2001. On September 13, 2001, the district court filed a Memorandum of Opinion and Order, in which it granted summary judgment to Defendants on all counts of Plaintiff's second amended complaint. Additionally, the memorandum opinion determined that: (1) Plaintiff's various discovery-related complaints lacked merit; (2) Plaintiff's Exhibit 105 was fraudulent (pursuant to Defendants' notice of fraud) and therefore would not be considered on summary judgment; and (3) Plaintiff's notice of fraud lacked merit. The court entered judgment for Defendants on the same day. Plaintiff filed a notice of appeal on September 26, 2001.

### 1. The Parties

Plaintiff is a prison inmate who, at all times relevant, was incarcerated at the Lorain Correctional Institution ("Lorain") in Grafton, Ohio.

Defendant Janice R. Yarrow was a librarian at Lorain from October 1993 until June 1996. Yarrow was responsible for the administration of the main law library and the supervision of inmate employees. Yarrow was Plaintiff's supervisor while he was employed in the library. Defendant Patricia Crouthers was Defendant Yarrow's supervisor. Defendant Bennie Kelly was the Deputy Warden of Training, Instruction and Education at Lorain and was responsible for inmate job assignments. Defendant Norman Rose was the Warden at Lorain and was responsible for the administration, supervision, and operation of the facility, as well as for the promulgation and enforcement of rules, regulations, policies and practices at the institution. Rose was also responsible for the hiring, training, retention and screening of his subordinates, including the other named Defendants.

Defendant Francisco Leano was a prison doctor charged with administering appropriate and necessary medical care to the inmates incarcerated at Lorain. Defendant Lois Rathwell–Love was the Hospital Administrator at Lorain from 1991 through 1998 and was responsible for the administration, supervision, and operation of the prison hospital. Defendant Darlene Drwal was a prison nurse charged with assisting Lorain prison doctors and staff in the care of inmates.

Defendant Maria J. Armstrong was a substance abuse supervisor at Lorain. Defendant Roberta K.E. Winkle was a job clerk at Lorain.

Defendant Todd R. Marti was a member of the Ohio Attorney General's office. The allegations in Plaintiff's complaint stem largely from Defendants' alleged failures to provide Plaintiff with adequate medical care for his serious medical condition, to wit, a hernia.

### 2. Plaintiff's Allegations

#### a. Initial Deliberate Indifference to Plaintiff's Hernia

On or about June 5, 1991, Plaintiff first began to experience symptoms of what was eventually diagnosed as a hernia. Plaintiff's hernia apparently caused him great pain and severely limited his ability to move, lift objects, and perform many other activities. Plaintiff further alleges that Defendants Leano, Rathwell–Love, and Drwal had "actual knowledge" of Plaintiff's condition, yet were deliberately indifferent to his need for medical treat-

ment from 1990 through at least 1994. According to Plaintiff, this deliberate indifference allowed and facilitated Defendant Yarrow's assignment of Plaintiff to injurious tasks including heavy lifting. Specifically, Plaintiff alleges that Defendant Leano initially misdiagnosed Plaintiff and refused to issue him a work restriction form. Plaintiff complained to both Defendants Rose and Rathwell–Love concerning his treatment (or lack thereof) at the hands of Leano and Drwal.

### b. Deliberate Indifference and Retaliation at the Library

Plaintiff began working as a law clerk in Lorain's main library in 1993 under the supervision of Defendant Yarrow. Plaintiff claims that Yarrow, despite her knowledge of Plaintiff's medical condition, required him to perform strenuous work such as picking up and delivering books and newspapers. On September 14, 1994, Plaintiff filed an internal complaint with Yarrow's supervisor, Defendant Crouthers, about Yarrow's deliberate indifference. Plaintiff subsequently filed a lawsuit against Yarrow on September 29, 1994, alleging that Yarrow was deliberately indifferent to his medical condition. Although the complaint was not filed until September 29, 1994, and Yarrow apparently was not served with the complaint until November 18, 1994,[4] Plaintiff claims that Yarrow confronted him about the complaint on September 27, 1994, and when he informed her that he had filed two complaints against her, she allegedly responded, "That's one reason I was told not to give you the desk clerk's job and to write you up if you caused me any problems in not doing what I tell you to do." (J.A. at 35–36.)

On December 7, 1994, Defendant Yarrow allegedly banished Plaintiff from the library, telling Plaintiff that he could no longer use the library or its services, on orders from Defendant Kelly. The following morning, Plaintiff met with Kelly, who told him that he was being removed from his library position, but that he could still access the library just like other inmates. However, according to Plaintiff, Defendant Yarrow continued to deny him library access. On another occasion, Plaintiff requested use of a typewriter and some paper. Yarrow told Plaintiff that he would have to carry a typewriter to the education department and use it there once one became available. When Plaintiff confronted Yarrow with the fact that there were three typewriters not being used, Yarrow replied that they were on "reserve" and ordered Plaintiff to wait outside until one became available. (J.A. at 37.) Yarrow also allegedly refused to photocopy legal documents as Plaintiff requested, upon seeing that the documents contained her name. According to Plaintiff, the removal from his library position was the result of a conspiracy between Defendants Yarrow, Kelly, Rose, Crouthers, and Marti on or about December 7, 1994, in retaliation against Plaintiff for having filed the complaint against Yarrow. According to Plaintiff, he repeatedly complained to Defendants Crouthers, Kelly, and Rose regarding Yarrow's denial of access to the library, to no avail.

Plaintiff alleges that on December 30, 1994 Defendant Winkle threatened to change the results of Plaintiff's drug test if Plaintiff did not drop his lawsuit against Defendant Yarrow. Plaintiff also alleges that another inmate overheard Defendant

---

4. This is according to the district court's Memorandum Opinion and Order. However, because Plaintiff claims to have filed two complaints against Yarrow, the district court may have confused the dates of the two cases.

Armstrong tell Winkle that she could change the results of Plaintiff's drug test.

### c. The Hernia Surgeries and Subsequent Deliberate Indifference

On November 30, 1994 and February 8, 1995, Plaintiff underwent surgery for his hernia condition. Plaintiff claims that the surgeries failed to correct his hernia fully and adequately. Following his second surgery, Plaintiff was sent to the Corrections Medical Center ("CMC") to recover. While still medicated, Plaintiff was placed in a holding cell with restraints and left unattended for approximately eleven hours. During this time, Plaintiff claims that he fell off the bench on which he was lying and re-injured himself.

Plaintiff claims that, upon returning to Lorain on February 15, 1995, he told Defendants Leano, Rose, and Rathwell–Love of his fall. However, Leano allegedly refused to examine him or give him any pain medication and released him into the general population. Plaintiff further claims that Leano refused his requests to be examined on May 2, 1995 and April 11, 1996.

Plaintiff wrote a letter to Congressman Louis Stokes regarding Defendants' alleged deliberate indifference. Congressman Stokes responded on April 25, 1995 by asking Defendant Rose's predecessor to make an inquiry into Plaintiff's complaints. Plaintiff alleges that Defendant Rathwell–Love approached him, informed him that she had received Congressman Stokes' letter, and threatened to transfer him to another institution if he ever wrote another such letter. Plaintiff wrote another letter to Congressman Stokes, informing him of Rathwell–Love's alleged threats.

Eventually, Plaintiff dismissed his consolidated case filings and brought another action against Defendants in July 2001. As mentioned earlier, Plaintiff's case was dismissed on summary judgment on September 13, 2001.

### II.

This Court reviews a grant of summary judgment on the grounds of qualified immunity *de novo*. *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir.1996). Summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Birgel v. Bd. of Comm'rs*, 125 F.3d 948, 950 (6th Cir.1997). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. Eighth Amendment (Deliberate Indifference) Claim

Plaintiff contends on appeal that the district court erred in granting summary judgment to Defendants regarding his deliberate indifference claim. Plaintiff had alleged in his amended complaint that Defendants Leano, Drwal, Rathwell–Love, Rose, Yarrow and Crouthers had violated his Eighth Amendment right to be free from cruel and unusual punishment, by exercising deliberate indifference to Plaintiff's medical condition. We will discuss each of the Defendants seriatim.

### a. Defendant Yarrow

Plaintiff alleged in his amended complaint that Defendant Yarrow was deliberately indifferent to his serious medical condition when she ordered him to perform various physical tasks that caused him unnecessary suffering. The district court dismissed this claim, reasoning that Plain-

tiff failed to establish a genuine issue of material fact as to Yarrow's knowledge that Plaintiff suffered from the hernia. Plaintiff argues on appeal that he did establish Yarrow's knowledge. In support of this contention, he points to an affidavit he submitted which gave sworn testimony about an incident between Plaintiff and Yarrow. The affidavit recounted an incident during which Plaintiff's hernia apparently became so visibly swollen that on June 4, 1994, Yarrow confronted Plaintiff, asking him if he was concealing something. Plaintiff avers that he informed Yarrow about his hernia condition and showed her a copy of his bottom bed order, which had been issued on November 18, 1993. Following this incident, Plaintiff claims that Yarrow ordered him to engage in a number of strenuous activities, such as carrying a microfiche machine out to a cart on September 13, 1994. Subsequently, on September 19, 1994 Plaintiff obtained notations from a Lorain doctor indicating that Plaintiff should not engage in heavy lifting.

In rebuttal, Yarrow submitted an affidavit averring that at no time prior to October 4, 1994 did she have any knowledge that Plaintiff had any health-related restrictions on his job duties. However, there also exists an acknowledgment from Defendant Crouthers that she spoke with Yarrow on September 15, 1994 about Plaintiff's hernia condition; thus, it is safe to say that this is the cut-off date, after which Yarrow allegedly possessed requisite knowledge and could be held liable for any indifference to Plaintiff's medical condition thereafter. The next relevant question is whether Plaintiff has produced evidence of any incidents with Yarrow after September 15, 1994. Plaintiff insists that he did, and points to his amended complaint, as well as an affidavit, where he averred that Yarrow's deliberate indifference continued "up until Nov–30–94, when

Plaintiff had surgery." (Plaintiff's Br. at 19 (citing J.A. at 37, 39; Add Exh. 19–1 ¶ 7, 19–2 ¶¶ 8–9).)

▄ The evidence indicates one such alleged incident on September 28, 1994, when Yarrow ordered Plaintiff to move some bookshelves. Defendants nevertheless claim that Yarrow was not sufficiently aware of the risk such a task would impose on Plaintiff's health because no work restriction form had been submitted to her until October 4, 1994. In support, Defendants cite *Reeves v. Collins*, 27 F.3d 174 (5th Cir.1994), where the Fifth Circuit held that detention officers were not deliberately indifferent to inmate's serious medical needs when they ordered an inmate to perform cleaning duties before discovering that the inmate had a double hernia. In so finding, the court noted that the inmate's medical file contained no health-related work restriction. *Id.* at 176–77. The court further noted, "[m]oreover, there was no indication at the time, besides Reeves' assertions of pain, that Reeves had a hernia." *Id.* at 177. Thus, the Fifth Circuit was not establishing a rule that a prison official may continue to subject a prisoner to health-threatening tasks until he or she receives a work restriction order. And unlike *Reeves*, Plaintiff claims to have informed Yarrow of his medical condition on several occasions. Not only that, but Defendant Crouthers *also* informed Yarrow about Plaintiff's hernia after Plaintiff complained that Yarrow ordered him to engage in heavy lifting. Thus, Yarrow was *actually aware* of Plaintiff's serious medical condition on September 15, 1994, yet she ordered Plaintiff to engage in heavy lifting on September 29, 1994. We believe it was error to dismiss this claim based on *Reeves,* and reverse the district court as to this claim.

### b. Defendants Drwal, Rathwell–Love, and Leano

Plaintiff also alleged that Defendants Drwal, Rathwell–Love, and Leano were deliberately indifferent to his serious medical condition while treating him for his hernia. To state an Eighth Amendment claim in a medical mistreatment case, "a prisoner must show unnecessary suffering brought about by the deliberate indifference of prison medical staff to his needs." *Thaddeus–X v. Blatter*, 175 F.3d 378, 401 (6th Cir.1999).

A claim premised upon deficient medical care "has two components, one objective and one subjective." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir.2001). The objective element is satisfied if the plaintiff alleges "that the medical need at issue is 'sufficiently serious.'" *Id.* at 702–03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The subjective component is satisfied if the plaintiff "allege[s] facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703. As such, a prison official will not be held liable under the deliberate indifference standard for simple negligence. *Farmer*, 511 U.S. at 835 (noting that deliberate indifference "describes a state of mind more blameworthy than negligence"); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Rather, as the Supreme Court has explained, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly*

*disregarding* that risk." *Farmer*, 511 U.S. at 836 (emphasis added).

Proving that a defendant had a sufficiently culpable mental state to make he or she liable for deliberate indifference is a plaintiff's burden. *Comstock*, 273 F.3d at 703. This burden can be met "in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted).

It seems to be conceded that a hernia meets the "sufficiently serious" standard. The second prong of the deliberate indifference test is whether the doctors were subjectively aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, and whether they actually drew such an inference. *Id.*

For instance, if a prison doctor fails to examine a prisoner, even when the doctor suspects a serious medical condition exists, such doctor may be deemed to be subjectively aware of a serious risk and to have disregarded that risk, for purposes of the Eighth Amendment inquiry. *Comstock*, 273 F.3d 693 (holding that allegations of a prison psychologist's "grossly inadequate" evaluation of an inmate who subsequently committed suicide, if proven, would constitute deliberate indifference to the inmate's serious medical needs as a matter of law, thus precluding summary judgment on qualified immunity grounds).

Plaintiff maintained in this lawsuit that he was denied medical care by the doctors when he sought such medical care. Plaintiff avers in an affidavit that every time he went to the facility the medical staff was always "indifferent" towards him. (Add. Exh. 131–2 ¶ 10, Exh 134 ¶ 7.) However, none of these affidavits offer any specifics or indicate the deficiencies in Plaintiff's

care. Although he may have been dissatisfied with their handling of his case, this alone is insufficient to establish an Eighth Amendment claim.

Moreover, Plaintiff does not refute an affidavit submitted by Defendant Rathwell–Love, which avers that Plaintiff's medical history shows that he had been seen on 47 occasions for his hernia condition, and that on several of those occasions Plaintiff refused the offered treatment. The affidavit also points out that Plaintiff received two operations at Ohio State University Hospital, on November 30, 1994 and February 8, 1995, for his hernia condition, which Plaintiff has never denied. As to this medical care, Plaintiff has not been able to establish that such treatment was not medically appropriate under the circumstances.

■ The parties dispute the quality of his post-operation treatment. Defendant Rathwell–Love avers in an affidavit that Plaintiff refused medical treatment or examination from the medical defendants after March 20, 1995. None of the evidence (including Plaintiff's affidavits) provide any details as to what occurred when he sought treatment for the hernia, except that when he went for his annual physical (not seeking treatment for a hernia problem), Defendant Leano realized that Plaintiff had a lawsuit pending against him and advised Plaintiff that he would have to be examined by another Lorain doctor. This alone is insufficient evidence that any of Defendant's doctors were deliberately indifferent to Defendant's hernia condition. We therefore do not believe that Plaintiff has marshaled sufficient evidence to sustain this claim.

### c. Defendants Rose and Crouthers

The district court dismissed Plaintiff's Eight Amendment and retaliation claims against Defendants Norman Rose, who was the warden at Lorain, and Patricia Crouthers, who was Defendant Yarrow's supervisor. The district court reasoned that even if Plaintiff was retaliated against by Yarrow and others, Plaintiff had failed to produce any evidence establishing that Rose or Crouthers knew of such conduct.

We have previously ruled that prison supervisors' liability for the violation of an inmate's rights is limited, inasmuch as "Section 1983 liability will not be imposed solely upon the basis of respondeat superior." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). Instead, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.*

In the instant case, Plaintiff's amended complaint does not directly implicate either Rose or Crouthers in the alleged constitutional violations. All alleged activity occurred at the hands of Yarrow or others. Plaintiff seems to argue that Warden Rose and Supervisor Crouthers knew or should have known what was going on.

We disagree with Plaintiff. In discovery, plaintiff produced various informal complaints he apparently filed with Lorain, and indeed those documents are addressed to either Rose or Crouthers. Defendants point out that nothing on those documents indicates that either Rose or Crouthers received them. The district court accepted Defendants' explanation, reasoning that because no notations were made by either Rose or Crouthers on all but one of the informal complaints, it was reasonable to infer that Rose and Crouthers did not receive the complaints. In any event, there seems to be insufficient evidence

that Defendant Rose knowingly acquiesced in anything. Rose averred that he knew nothing about the situation, and Plaintiff does not adequately rebut this.

It is agreed that Crouthers did receive at least one informal complaint filed by Plaintiff. This particular complaint was dated September 14, 1994, and on it Plaintiff complained, "On 9–13–94, Grievant was informed by Janice Yarrow Grievant [sic] job supervisor, to help those who had to fix the viewer, take it out to a cart." The complaint also mentioned the typewriter incident (*See* discussion *infra*). Crouthers completed the bottom portion of the form (entitled "Action taken by the staff members to informally resolve the complaint"), where she indicated, in a statement dated the following day (9/15/94), the following:

I talked with Ms. Yarrow on 9–15–94. Ms. Yarrow knows about your medical problem and stated that she asked you to show the maintenance individuals how the machine works/what the problem was due to the fact that you seemed to know the inner workings of the machine & you had showed her yourself what you thought was wrong with it on several occasions. You were *not* expected to lift or carry the machine. The typewriter situation will be remedied, as a policy will be written to state that the typewriters are available for use by the legal clerks and by the reception inmates: typewriters will not be assigned or issued to anyone, but will be available. (Plaintiff's Exh. 36–1.) Thus, it does not appear that Defendant Crouthers acquiesced in any alleged retaliatory behavior by Yarrow. In fact, she took steps to remedy the situation.

■ We therefore conclude that Defendants Rose and Crouthers cannot be held vicariously liable for the alleged behavior of Yarrow and others and affirm the district court's dismissal on this issue.

### 2. Retaliation Claims

Plaintiff also protests dismissal of his retaliation claim, asserting that controlling law does not allow prison officials to retaliate against Plaintiff for exercising his First Amendment right to file administrative grievance against prison officials.

To establish a claim of retaliation, Plaintiff must show the following: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (citations omitted). The second element (adverse action) and third element (causal connection) are at issue here.[5]

Regarding the second element, we have recognized that "[i]t is not necessarily true, however, that every action, no matter how small, is constitutionally cognizable." *Thaddeus–X*, 175 F.3d at 396 (citing *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). Thus, in the prison context, "an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Id.* (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)); *see also Bloch v. Ribar*, 156 F.3d 673, 678 (6th

---

5. No one disputes that the activity in question (access to the courts) is protected conduct under the Constitution. *See Lewis v. Casey*, 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (a prisoner has a right of access to the courts insofar as the legal claim pertains to direct criminal appeals, habeas corpus applications, and civil rights claims challenging the conditions of confinement).

Cir.1998) (requiring plaintiff to prove, for a First Amendment retaliation claim, that "the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity"). Although the effect on the freedom of speech "need not be great in order to be actionable," *Bart*, 677 F.2d at 625, § 1983 requires injury and "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . ." *Id.* This Court, sitting *en banc*, attempted to explain the contours of this inquiry:

Like the definition of protected conduct, however, the definition of adverse action is not static across contexts. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse. The benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial of actions from constitutional cognizance. We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment. Retaliation against a prisoner is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts. *Thaddeus–X*, 175 F.3d at 398. Thus, the "relevant showing in such cases must be more than the prisoner's personal belief that he is the victim of retaliation." *Johnson*, 110 F.3d at 310 (citation omitted). "In the prison context,

an action comparable to transfer to administrative segregation would certainly be adverse," as would "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates," *Thaddeus–X*, 175 F.3d at 396, 398, or the deprivation of prescribed pain medication, *Hall v. Nusholtz*, 234 F.3d 1268 (Table), 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *see also Cruz v. Beto*, 603 F.2d 1178, 1180 (5th Cir.1979) (inmates segregated into a separate unit, number of inmates per room doubled, access to the commissary reduced, cell searches increased, recreation and educational programs limited, and inmates made ineligible for good time credits unless inmates would agree to drop lawsuits filed by a certain attorney); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996) (finding that blocking an expeditious transfer to protective custody would be an adverse action).

A plaintiff must also establish a causal connection between the protected conduct and the adverse action to sustain a claim of retaliation. In evaluating the sufficiency of a plaintiff's showing on the third element, we have directed that courts apply the mixed motive analysis set forth in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Thaddeus–X*, 175 F.3d at 399.

Under this framework, once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. *Mount Healthy*, 429 U.S. at 287. "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus–X*, 175 F.3d at 399. Simply denying the plaintiff's allegations will not suffice to meet defendant's summary judgment burden in this regard. *Id.*

### a. Retaliation via Job Transfer and Denying Library Access (Defendant Yarrow)

Defendant Yarrow requested that Plaintiff be transferred from his job as a law clerk at Lorain's main library, and in fact Plaintiff was transferred to a unit library. Plaintiff alleged in his complaint that the job transfer was in retaliation for his having filed informal complaints and lawsuits. The district court dismissed this claim, reasoning that a job transfer alone does not constitute adverse action for § 1983 retaliation purposes.[6] We note that in a sworn affidavit, Defendant Kelly avers that he met with Plaintiff and explained to him that he was being reassigned to another library, but that his job title and pay would remain the same. Plaintiff does not dispute this.

■ In any event, Plaintiff's claim still fails. First of all, there is unrefuted evidence in the record that Yarrow lacked the authority to transfer Plaintiff; at most she could request such a transfer. Moreover, the record shows that Defendant Yarrow sent an interoffice memorandum, dated December 7, 1994, requesting that Plaintiff be transferred from his law clerk job at the main library because of concerns about Plaintiff's conduct and the impact of such conduct on the efficient operation of the library. Specifically, Yarrow contended in her memorandum that Plaintiff maintained a hostile and uncooperative attitude toward Yarrow and repeatedly failed to comply with her requests. The legitimate reasons Yarrow proffers for having requested the transfer have not been rebutted.[7]

Yarrow's alleged refusal to photocopy Plaintiff's documents seems rather *de minimis* to us, and fails on this appeal. Plaintiff does not allege that he was systematically denied the use of library equipment in proceeding with his case; rather he alleges only one incident. An isolated incident such as this is not likely to deter a person of ordinary firmness from pressing on with his lawsuit.[8] *Thaddeus–X*, 175 F.3d at 394, 396.

Plaintiff also alleges that he was denied access to the main law library.[9] Plaintiff acknowledged that he had access to the

---

6. On the other hand, of course, a custodial transfer to "administrative segregation," as this Court has held, would be an adverse action. *Thaddeus–X*, 175 F.3d at 396.

7. In an attempt to rebut the legitimate explanation, Plaintiff provided the district court with several affidavits from fellow inmates averring that Plaintiff was a good law clerk. However, the district court determined that those affidavits did not rebut Yarrow's assertions that Plaintiff engaged in certain hostile conduct toward Yarrow. At any rate, on appeal, Plaintiff argues that *any* retaliatory conduct is impermissible under Supreme Court case law. (Plaintiff's Br. at 11–12.) We have already determined this not to be the case; *de minimis* retaliatory conduct is not actionable.

8. On this point, the district court observed, "[T]here is no evidence the transfer or alleged refusal to photocopy documents deterred plaintiff from continuing to exercise his right of access to the courts." (Appendix B at 29;

J.A. at 680.) Yet this does not seem to be the appropriate inquiry. The inquiry is whether the alleged retaliatory conduct "would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus–X*, 175 F.3d at 396. The inquiry is more objective than subjective. However, it does seem that the fact that Plaintiff proceeded with the lawsuit offers some probative evidence that the conduct was not a sufficient deterrent under the objective standard.

9. Defendants seem to contest this assertion. For instance, Defendants have submitted a memo that Defendant Kelly wrote to file, in which he stated, "Inmate Smith questioned me regarding his being able to attend the main library during open hours. I clearly stated to Inmate Smith that he can attend the library as any other inmate would during normal cadre hours." (J.A. at 298.)

unit law library but contends in a sworn affidavit that the materials in that library were inadequate as they were not up-to-date. Yet, aside from this general statement in his affidavit, there is no evidence that the library materials in the unit library were inadequate. Moreover, he has not persuaded us that this alone would have the requisite chilling effect on litigants pursuing their First Amendment rights. *Thaddeus–X*, 175 F.3d at 396.

### b. Retaliation by Ordering Plaintiff to Perform Job Duties (Defendant Yarrow)

■ Defendants assert that because the underlying Eighth Amendment claim lacks merit, then the retaliation claim against Yarrow must also necessarily fail. (Defendants' Br. at 29–31.) We believe, however, that a genuine issue of material fact exists regarding Yarrow's alleged Eighth Amendment violation(s). The evidence tends to demonstrate the existence of Plaintiff's protected conduct (filing the lawsuit) and the alleged adverse action (forcing Plaintiff to do heavy lifting, etc.). The only remaining question is whether the evidence demonstrates a causal connection between those two elements. We believe that the causal connection is not particularly strong. Although the temporal proximity favors Plaintiff (only two weeks between Defendant Crouthers speaking to Yarrow about Plaintiff's internal complaint on September 15, 1994 and Yarrow's ordering Plaintiff to lift bookshelves on September 29), *see Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that temporal proximity alone may establish causation in certain circumstances), we think the inference of retaliation was overcome by Yarrow's unrefuted evidence that Plaintiff had been very uncooperative at work. *See Smith v. Campbell*, 250 F.3d 1032, 1038–39 (6th Cir.2001)

(although "the temporal proximity between [the prisoner plaintiff] filing his grievances and the decision to transfer him provides some circumstantial support for a causal connection" but the proximity was "easily overcome by the unrefuted evidence offered by the [prison defendants] that the transfer" occurred because of two incidents in which the plaintiff exhibited "aggressive, belligerent, and intimidating behavior towards other inmates and the staff").

### c. Threats to Change Drug Test Results (Defendants Armstrong and Winkle)

Plaintiff also alleges that Defendant Winkle threatened to change the results of his drug test. The district court dismissed this claim, holding that although actually changing the results of a drug test in retaliation for protected activity probably would be an adverse action, a mere threat to do so would not. In support, the district court cited such pre-*Thaddeus-X* cases as *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir.1987) (prison guards' threats to do bodily harm in retaliation for plaintiff's reports of prior beatings were insufficient to establish First Amendment retaliation), *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989) (in a police misconduct case [not a First Amendment retaliation case], police officer's words "I'm going to get you" are not actionable under § 1983), and *Washington v. Webster*, 883 F.2d 76 (6th Cir.1989) (unpublished) ("A threat to do harm in order to interfere with plaintiff's constitutional rights does not itself give rise to a constitutional violation."). We do not agree with Plaintiff that mere threats alone are always sufficient to sustain a retaliation claim, and it seems to us that even if this circuit has ever adopted such a rule, then *Thaddeus-X* has overruled it. Certainly, as *Thaddeus-X* recognized, "certain threats or deprivations are

so *de minimis* that they do not rise to the level of being constitutional violations." 175 F.3d at 398.

Yet, "this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* Thus, if the threat would "deter[ ] a person of ordinary firmness from exercising his or her right to access the courts," *id.*, then it seems to us that it is actionable. Indeed, we think a threat to change drug test results would deter many people of ordinary firmness from proceeding with litigation. After all, a positive drug test can negatively impact the prisoner's future job prospects, ability to get out early, make parole, or enjoy certain privileges, and on balance, many prisoners may feel that pursuing the protected activity would not be worth the risk. We can envision many prisoners being deterred by such a threat of retaliation, even though Plaintiff was not deterred.

■ However, we do not believe that Plaintiff has put forward enough evidence to survive summary judgment on this issue. Plaintiff offers the affidavit of a fellow prison inmate, James Bowe, who averred that he overheard a telephone conversation between Armstrong and Winkle, in which Armstrong stated that Plaintiff's drug test had come back negative and that "anything on paper could be change [sic]." (J.A. at 537.) Aside from the fact that what the fellow inmate overheard was somewhat ambiguous, Plaintiff never alleges that Winkle directly threatened him. Basically, the evidence adduced thus far amounts to no more than unsubstantiated rumor and innuendo. Therefore, we affirm the district court's dismissal of this claim, though on different grounds than the district court.

**d. Threats to Transfer Plaintiff to Another Prison (Defendant Rathwell–Love)**

Plaintiff also alleged in his amended complaint that Defendant Rathwell–Love threatened to have Plaintiff moved to another prison if he did not terminate his lawsuit and internal complaints. The district court dismissed this claim because it was a mere threat. (J.A. at 682 n. 7.) Although we affirm the dismissal of this claim, it is not because threats are never actionable, but the underlying conduct (a transfer) does not constitute adverse action.

■ We have repeatedly held that transfer from one prison to another prison "cannot rise to the level of an 'adverse action' because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights." *Mandela v. Campbell*, 181 F.3d 102 (Table), 1999 WL 357825, at *3, (6th Cir. May 26, 1999); *accord Goss v. Myers*, 208 F.3d 213 (Table), 2000 WL 125905 (6th Cir.Jan. 28, 2000); *Goddard v. Kentucky Dep't of Corr.*, 205 F.3d 1340 (Table), 2000 WL 191758 (6th Cir. Feb. 7, 2000); *Herron v. Campbell*, 198 F.3d 245 (Table), 1999 WL 1045158 (6th Cir. Nov. 9, 1999). We therefore agree with the district court on this point.

**e. Retaliation by Withholding Medical Care from Plaintiff**

■ Because Plaintiff has not established that any care he underwent was substandard, Plaintiff did not suffer an adverse action from his doctors. Therefore, Plaintiff's retaliation claim (based on First Amendment theory) must necessarily fail.

Plaintiff's retaliation argument seems to center on the incident where Defendant Leano, upon discovering that Plaintiff was suing him, told Plaintiff that another Lo-

rain doctor would have to give him the annual physical examination. Such a decision was not sufficiently adverse to chill Plaintiff from continuing to engage in his First Amendment activity, i.e., the lawsuit against Leano and others. *Thaddeus-X,* 175 F.3d at 396. Therefore, we believe that this claim lacks merit.

### III.

In his brief opposing summary judgment, Plaintiff contended that he did not receive all of the discovery that he was entitled to receive, and therefore summary judgment was inappropriate at the time. With his brief, Plaintiff included an affidavit pursuant to Federal Rule of Civil Procedure 56 ("Rule 56 Affidavit"), which listed the evidence he still had not received from Defendants. The district court denied his request for additional discovery, and Plaintiff claims on appeal that this decision was in error. Defendants counter that Plaintiff was given an opportunity to clarify his discovery requests pursuant to this Court's previous discovery Order, but he did not do so. In addition, Defendants claim that Plaintiff had the opportunity to review his voluminous grievance file in the previously filed lawsuit. We agree with Defendants.

■ Rule 56(f) provides that a district court may deny summary judgment to allow a party opposing summary judgment to conduct further discovery. The party requesting additional discovery under Rule 56(f), however, must demonstrate how the additional discovery requested will rebut the movant's showing of the absence of a genuine issue of material fact. *Emmons v. McLaughlin,* 874 F.2d 351, 356–57 (6th Cir.1989). The district court correctly found that Plaintiff failed to bear his burden of demonstrating how the discovery he sought would preclude summary judgment.

■ Furthermore, the district court did not abuse its discretion by requiring Plaintiff to fund his own litigation efforts and clarify his discovery requests. A prisoner plaintiff proceeding *in forma pauperis* may seek a waiver of certain pretrial filing fees, but there is no constitutional or statutory requirement that the government or Defendant pay for an indigent prisoner's discovery efforts. *See Johnson v. Hubbard,* 698 F.2d 286, 289 (6th Cir. 1983) (holding that there is no constitutional or statutory requirement to waive an indigent prisoner plaintiff's costs of discovery). In *Giles v. Tate,* 907 F.Supp. 1135, 1138 (S.D.Ohio 1995), which Plaintiff cites, the court found that a copying charge of thirty-five cents per page paid in advance violated a prisoner's constitutional right to access the courts. But the court also found that prisoners do not have a constitutional right to free copying and that ten cents per page is reasonable and does not unconstitutionally impede a prisoner's access to the courts. *Id.*

■ Plaintiff also protests the fact that the district court allowed Defendants to file documents through the Northern District of Ohio's Electronic Case Filing System (ECFS), on two bases: (1) such electronic case filing violates Rule 11 of the Federal Rules of Civil Procedure, and (2) the case management order prohibited electronic case filings. (Plaintiff's Br. at 22–24). We find no abuse of discretion on the district court's part. Rule 11 does require that "[e]very pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party." Fed.R.Civ.P. 11(a). It also further dictates that "[a]n unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attor-

ney or party." *Id.* However, electronic filing is an approved alternative, where the attorney of record can "sign" by providing the party's identification name and password. *See* L.R. 5.1 (N.D.Ohio); General Order 97–38.

Plaintiff also points to the case management plan, which stated that "[t]his case is not suitable for Electronic Case Filing (ECF)." (J.A. at 23.) However, the district court agreed with Defendants that the case management plan never expressly prohibited the use of ECF. More importantly, Plaintiff does not explain how he is prejudiced by the use of the ECF system. Therefore, we do not believe that the district court abused its discretion in finding that Plaintiff's arguments lacked merit and, consequently, in denying Plaintiff's motion.

### IV.

Plaintiff's next argument is that the district court abused its discretion in denying his motion for leave to file an amended complaint. This Court "review[s] a district court's decision to deny leave to amend a complaint for abuse of discretion." *Shepherd v. Wellman,* 313 F.3d 963, 968 (6th Cir.2002) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

As to the merits of Plaintiff's argument, we think the district court did not abuse its discretion on this issue. "Pursuant to Rule 16(b), a scheduling order establishing deadlines for matters such as joinder and amendments to pleadings 'shall not be modified except upon a showing of good cause and by leave of the district judge.'" *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir.2002) (quoting Fed.R.Civ.P. 16(b)). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Id.* (quot-

ing *Bradford v. DANA Corp.,* 249 F.3d 807, 809 (8th Cir.2001)) (internal citations omitted). "Another relevant consideration is possible prejudice to the party opposing the modification." *Id.* (citing *Bradford,* 249 F.3d at 809) (internal citations omitted).

Plaintiff avers that he gave the prison officials his motion on November 24, 2000 to mail, and he has some "check out" slips in the record to back his contention. Even assuming Plaintiff's claim is true that he timely gave the motion to prison officials for mailing, this argument does not overcome the district court's decision to deny Plaintiff's motion to reconsider on the basis that his second amended complaint would be futile. Plaintiff does not address this basis for the district court's decision in his appellate briefs.

Nevertheless, the underlying allegations Plaintiff sought to add in all likelihood would have failed. Plaintiff wanted to add six unknown defendants, to wit, medical personnel who were allegedly indifferent to Plaintiff's medical needs from 1990 through May 1995, retaliated against Plaintiff in 1994, and discriminated against Plaintiff in 1994. Because the statute of limitations for a § 1983 civil rights action arising in Ohio is two years after its accrual, *Browning v. Pendleton,* 869 F.2d 989, 992 (6th Cir.1989) (*en banc*), the statute of limitations for filing such an action has long since passed. Therefore, Plaintiff's argument on this point lacks merit in any event.

### V.

We conclude that based on the evidence submitted at this point, Plaintiff cannot sustain his claims, except regarding Plaintiff's Eighth Amendment claim of deliberate indifference as to Defendant Yarrow. In all other respects, we believe the dis-

trict court properly granted summary judgment to the Defendants. For all the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part district court's grant of summary judgment as to all claims.

GIBBONS, Circuit Judge, concurring in part and dissenting in part.

I concur in all portions of the majority opinion except Part II.1.a., which reverses the grant of summary judgment to defendant Janice Yarrow on plaintiff's Eighth Amendment claim that she was deliberately indifferent to his serious medical needs.

To establish an Eighth Amendment claim for deliberate indifference, a plaintiff prisoner must present evidence that the defendant prison official was subjectively aware of the risk of serious harm and disregarded that risk by failing to take reasonable measures to avoid it. *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In its opinion granting summary judgment, the district court carefully and thoroughly analyzed the evidence and correctly found that no genuine issue of material fact existed as to Smith's Eighth Amendment claim. The district court found that Smith had failed to present evidence that Yarrow was aware that the routine work assignments she gave Smith posed a serious risk of harm to him. While there is evidence that Yarrow was aware of Smith's hernia, Smith failed to present evidence that Yarrow was subjectively aware that Smith's condition precluded him from safely carrying out library assignments. I agree fully with the district court's ruling on this issue and thus would affirm its judgment in all respects.